Fabricant, Judith, J.
INTRODUCTION
The defendants are charged with breaking into an apartment in Weymouth and stealing jewelry. Before the Court are their motions to suppress certain evidence and statements. For the reasons that will be explained, the motions will be denied.
FINDINGS OF FACT
After an evidentiary hearing, the Court finds as follows. On August 1, 2005, at 8:55 p.m., Detective Sergeant Richard Keller of the Weymouth Police Department responded to a 911 call from an apartment at 12 Gaslight Drive. He met with Mr. and Mrs. Alves, who reported that they had gone out briefly, and returned to find their patio door open, Mrs. Alves’s jewelry box emptied, and a cellular telephone left on the floor. Keller picked up the cell phone from the floor and attempted to turn it on, but found the battery drained. He removed the battery and inserted his own, which succeeded in turning the phone on. He then scrolled through the directory and found an entry labeled “Mom.” He reported that number to the dispatcher, who checked listings and reported back to him that the number was listed to Patricia Aiello, at 10 Gaslight Drive, apartment 1. That apartment was some twenty to thirty yards from the scene of the break in.
Keller went to that address. Patricia Aiello was not at home, but her boyfriend, Gazi Sliman, was. Sliman informed Keller that Aiello’s son, George Cahoon, had been there earlier with a friend, and that he was out in his mother’s car, a 1992 gray Chevrolet Lumina, the license plate number of which Sliman provided. Sliman was shown the cell phone, and indicated that he thought it belonged to George Cahoon.
Keller arranged for an announcement to be broadcast over the Weymouth Police radio to look for Aiello’s car. He then set out to check addresses where he thought Cahoon might be found, based on information from Sliman. Detective Alstead saw the car on Route 18, and so notified Keller, who quickly caught up with Alstead at that location. Both were in plainclothes, operating unmarked police cruisers with emergency lights. Alstead activated his emergency lights to stop the Lumina. Cahoon, driving the Lumina, did not stop, but turned into the parking lot of a pizza restaurant. He went around the back of the restaurant, arriving at a location where a cliff prevented further travel. Both Alstead and Keller stopped behind him, got out of their cruisers, and approached the Lumina. Alstead went to the driver’s side, where he found Cahoon, and Keller went to the passenger’s side, where he found defendant Brian Michaels. Each officer opened a car door, and requested identification. As he spoke with Michaels, Keller saw several gold rings on the split bench seat between the two defendants in the car.
The officers directed both defendants to get out of the car, and handcuffed them. Once the defendants were out of the car, the officers brought them to its rear, and Alstead gave Miranda warnings to both defendants. Both appeared intoxicated. Nevertheless, when asked whether they understood the Miranda warnings, both responded that they did. Other officers had arrived in police cruisers, and the defendants were placed in separate cruisers. Keller spoke with Michaels, who stated that he had been “just along for the ride,” and that the rest of the jewelry was “stuffed under the dashboard.” Keller sent an officer to look inside the car; that officer found seven rings on or between the front seats, and a bag of jewelry in the dashboard. Also in the bag were ten five-dollar telephone calling cards. Keller then spoke with Cahoon, telling him that the police had found his cell phone, and that Michaels had said Cahoon had committed the crime. Cahoon said that Michaels was the one who had tried to hide jewelry under the seat and had stuffed the bag of jewelry under the dashboard. The items recovered were shown to the Alves, who identified the jewelry, and also reported that telephone *627 calling cards that had been in their apartment were missing.
DISCUSSION
The defendants argue that Keller’s use of the cell phone amounted to an unjustified warrantless search.[1] The first step in evaluating that claim is to determine whether a search occurred at all, in the constitutional sense. On that point, the defendants have the burden of proof. See Commonwealth v. Pina, 406 Mass. 540, 544 (1990). Whether a search occurred depends on “(w]hether the government’s activity intruded on the defendant’s reasonable expectation of privacy.” Id. at 544. “For a search to have taken place, the defendant must have had a subjective expectation of privacy, and that expectation must have been one that society recognizes as objectively reasonable.” Id. Whether a defendant has a reasonable expectation of privacy depends on all of the circumstances, including the nature of the place where the government activity occurs, and whether the defendant owned or controlled access to that place. Id. at 545. Also pertinent is whether the defendant had a possessory or ownership interest in the item taken or inspected, and whether the defendant has taken normal precautions to protect his privacy. Id.
In Pina, the defendant left his wallet in a fellow resident’s room at a halfway house, after he had moved out. Rooms in the halfway house were subject to search by officials of the private entity that operated the facility under contract with the Department of Correction. A staff member of the halfway house found the wallet about two weeks after the defendant had moved out, and turned it in to the director, who examined it to identify its owner, and then gave it to police. Police examined it then, found nothing of significance, and kept it. Some two years later, police examined it again and found a theater ticket that connected the defendant to the crime. At the hearing on the motion to suppress, the defendant offered testimony that he had “secured” the wallet by leaving it in the area of his bed at the halfway house, and that after his move he had telephoned a fellow resident asking him to retrieve it. The Supreme Judicial Court held that these facts “did not warrant a finding that any expectation of privcay that the defendant might have had with respect to the wallet was a reasonable one.” Id. at 545.
The facts of Pina differ from those presented here with respect to both place and time: This case does not involve a facility under contract with the Department of Correction, in which residents are subject to search, and the time between Cahoon’s leaving his property behind and the police examination of it was short compared to that in Pina. Nevertheless, consideration of the factors identified in Pina leads to the same result. Most important here is the place: a private home not belonging to the defendant, into which the defendants had intruded without the permission of the occupants, and without any claim of right. Clearly, the defendants had no reasonable expectation of privacy in that place. Cahoon had a possessory or ownership interest in the cell phone, but the evidence does not indicate that he took normal precautions to safeguard that interest. It does not appear that he intended to leave it at the Alves’s apartment, but he took it there, a place he had no right to be, and then failed to take care to remove it with him. Nor did he return promptly to retrieve it. The evidence thus fails to establish that Cahoon had a reasonable expectation of privacy in the cell phone when police found it at the scene. Indeed, the invasion of privacy in this case was committed not by police in the use of the cell phone, but by the defendants themselves, in entering the Alves’ home and leaving Cahoon’s property there.
The defendants cite Commonwealth v. Straw, 422 Mass. 756, 750-62 (1996). In that case the defendant, upon being arrested on a warrant in his home, threw a briefcase through the window, into his own backyard, which was enclosed by a fence. The Court held that the defendant had not abandoned the briefcase, and continued to have a reasonable expectation of privacy in it, such that although the police could properly seize the briefcase, they were required to obtain a warrant before opening it. That holding is entirely consistent with the analysis provided in Pina; the factor most significant in establishing the defendant’s expectation of privacy was that the briefcase was found in his own yard, a place where he had a strong expectation of privacy. The facts of Straw differ from these in a very important respect; here, the cell phone was left not in the defendant’s own yard, but at the scene of a break in, a place where he had no expectation of privacy whatever.
The defendants also cite a California appellate decision, People v. Daggs, 34 Cal.Rptr.3d 649 (2005). That case is similar to this one on its facts, but does not support the defendants’ position. There police found a cell phone at the scene of a drug store robbery. A week after the robbery, police removed the battery from the phone to reveal its serial number, and used that information to obtain records from the telephone company identifying the subscriber; that information led to identification of the defendant as the robber. At the motion hearing, the defendant testified that he realized the phone was missing after a few hours, but did not return to retrieve it because he believed that doing so would lead to his arrest. Id. at 650.
On those facts, the Court held that the defendant had no reasonable expectation of privacy in the cell phone, because he had abandoned it by leaving it unattended in a public place and making no effort to reclaim it. The Court acknowledged that abandonment is a matter of intent, but observed that “the intent to abandon is determined by objective factors, not the defendant’s subjective intent . . . Abandonment here is not meant in the strict property-right sense, but *628 rests instead on whether the person so relinquished his interest in the property that he no longer retained a reasonable expectation of privacy in it at the time of the search.” Id. at 365-66. The objective circumstances were such, the Court held, that “it was infer-able that the telephone belonged to, or had been in the possession of, the robber who had fled the scene, thereby evincing his intent not to reclaim it.” On that basis, the Court held that the defendant had no reasonable expectation of privacy in it at the time police seized it from the store after the robbery, and certainly had none a week later when the detective removed the battery. Id. at 366-69.
The facts here show abandonment in the same sense as those in Daggs. Although Cahoon probably did not intend to discard the phone at the time he dropped it, and may have been unaware that he had done so, he voluntarily brought it to a place where he had no right to be, failed to take steps to prevent its loss, fled the scene without it, and did not promptly reclaim it. He thus abandoned any reasonable expectation of privacy in it, and the police examination of it did not constitute a search in the constitutional sense.
Having identified Cahoon as the owner of the cell phone, police had at the very least reasonable suspicion, if not probable cause, to believe that he had committed the break in. Having learned also that he was driving his mother’s car, with a companion, police had at least a reasonable basis to believe that evidence of the crime would be found in the car. Accordingly, police were entitled to stop the car. Cahoon’s failure to stop in response to the officers’ lights only added to the basis for suspicion, as did Keller’s observation of rings on the seat. At that point, the police had ample basis to direct the defendants out of the car and to search the car. Indeed, the defendants apparently so recognize, as the only challenge they raise to these events is based on their theory that the use of the cell phone was unlawful, so that everything that followed was fruit of the poisonous tree. That theory fails with its premise.
The defendants’ sole challenge to their statements rests on the same ground, and fails for the same reason. No other basis appears for challenging the statements; the evidence establishes beyond a reasonable doubt that each defendant was given full Miranda warnings, that each understood them, and that each waived his rights and spoke voluntarily, knowingly, and intelligently.
CONCLUSION AND ORDER
For the reasons stated, the Defendants’ Motions to Suppress Evidence are DENIED.

 Michaels has no standing to make this argument, since he does not claim any possessory interest in the cell phone. The Court nevertheless considers it as to both defendants, since it is properly raised by Cahoon.